IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :          CRIMINAL ACTION
                                  :
          v.                      :
                                  :
HERBERT VEDERMAN                  :          NO. 15-346-2

MEMORANDUM

Bartle, J.                                          March   22, 2019

Defendant Herbert Vederman, a businessman and
associate of former Congressman Chaka Fattah, Sr., was charged
along with Fattah and several others in a twenty-nine count
indictment alleging various political corruption schemes.
Specifically, Vederman was charged with the following offenses:
conspiracy to violate the Racketeer Influenced and Corrupt
Organizations Act ("RICO"), 18 U.S.C. § 1962(d) (Count 1);
conspiracy to commit bribery, in violation of 18 U.S.C. § 371
(Count 16); bribery, in violation of 18 U.S.C. § 201(b)(1)
(Count 18); bank fraud, in violation of 18 U.S.C. §§ 1344 and 2
(Count 19); false statements to a financial institution, in
violation of 18 U.S.C. §§ 1014 and 2 (Count 20); falsification
of records, in violation of 18 U.S.C. §§ 1519 and 2 (Count 21);
money laundering, in violation of 18 U.S.C. §§ 1957 and 2 (Count

22); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count 23).[1]

After a nearly month-long trial, Vederman was convicted of all eight counts against him.  Thereafter, this court granted the post-trial motion of Vederman to vacate his convictions on Counts 19 and 20 of the indictment for bank fraud and false statements to a financial institution.[2]  Our Court of Appeals reversed that ruling and remanded for sentencing on those counts.

Before the court is the renewed motion of Vederman for a judgment of acquittal or a new trial on Counts 19 and 20 under Rules 29(c) and 33(a) of the Federal Rules of Criminal Procedure.

I

Under Rule 29, the court must "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  The court must review the evidence in

---

1.  18 U.S.C. § 2 provides:  "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

2.  This court also granted the motion of Vederman under Rule 29 for acquittal on the RICO charge against him (Count 1).  The Government did not appeal that ruling and it is not relevant to our discussion here.  The Court of Appeals reversed Vederman's convictions on Counts 16, 18, and 22-23 as a result of the Supreme Court's decision in McDonnell v. United States, 136 S. Ct. 2355 (2016), which was handed down a few days after the jury returned its verdict of guilty.

the light most favorable to the Government to determine whether a rational jury could have found a defendant guilty beyond a reasonable doubt.  See United States v. Wolfe, 245 F.3d 257, 261 (3d Cir. 2001).  All reasonable inferences, of course, are drawn in favor of the jury's verdict.  A defendant carries a heavy burden when challenging the sufficiency of the evidence.  See United States v. Lore, 430 F.3d 190, 203-04 (3d Cir. 2005).

Pursuant to Rule 33, the court may grant a new trial "if the interest of justice so requires."  The standard of review under Rule 33 is different than under Rule 29.  Here, the evidence is not evaluated in the light most favorable to the Government.  Instead, a new trial may be granted if in the view of the court the verdict is against the weight of the evidence. See United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002). The court must consider whether there is "a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted."  See United States v. Silveus, 542 F.3d 993, 1004-05 (3d Cir. 2008) (quoting Johnson, 302 F.3d at 150).  Motions under Rule 33 "are not favored and should be 'granted sparingly and only in exceptional cases.'"  Id. at 1005 (quoting Gov't of Virgin Islands v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987)).

II

The evidence presented at trial, taken in the light most favorable to the Government, established the following facts relevant to Counts 19 and 20.  Chaka Fattah, Sr. served as a Congressman continuously since 1995 from Pennsylvania's Second Congressional District.  In 2006, he launched an unsuccessful bid to become Mayor of the City of Philadelphia.  Vederman, a successful businessman, was a personal friend of Fattah and was a former city and state official who was also active in Philadelphia politics.

On December 23, 2011, Fattah and his wife, Renee Chenault-Fattah, applied for a mortgage to purchase a second home in the Poconos region of Pennsylvania.  However, the Fattahs were short on the cash needed to close on the property. In an email sent on January 12, 2012, Chenault-Fattah offered to sell to Vederman for $18,000 a 1989 Porsche she owned.  Several hours later, Vederman responded that he would "love to purchase" the Porsche.  The next day, Vederman wired $18,000 to Fattah's Wright Patman Federal Credit Union account.

The Credit Union Mortgage Association ("CUMA") acted as the loan processing organization for the home mortgage.  On January 17, 2012, Victoria Souza, a loan processor for CUMA, contacted Fattah to verify the source of the $18,000. Specifically, Souza stated in her email:  "[w]ill require

-4-

documentation of source of funds for deposit made 1/13/2012 in
the amount of 18,000.  Need to show by paper trail the evidence
of where the funds came from, account statement from the account
to which the funds came from showing the funds came out of that
account."  Fattah responded:

> Good morning.  The 18,000 represents the
> proceeds from the sale of a car we own.  The
> car is a 1989 Porsche 911 Carrera . . . .
> This non-liquid asset was sold to meet the
> requirement we were notified of last week.
> On Wednesday the proceeds from sale were
> wired into account from buyer's account.
> This is a car we have owned and insured for
> more than a decade in great condition with
> only 67,000 miles.  The paperwork is in the
> process and the new owner is available to
> confirm purchase.

According to Souza, Fattah's email alone was
insufficient and thus further documentation was required by CUMA
to verify the source of the $18,000 wire.  As a result, on
January 17, 2012, Souza informed Fattah via emails that the
mortgage loan could not be approved and cleared to close without
a bill of sale and a copy of the signed title for the Porsche.
That same day, Fattah sent to Souza a bill of sale dated January
16, 2012 executed by Chenault-Fattah and Vederman and witnessed
by co-defendant Bonnie Bowser, a longtime aid to Fattah.  Later,
on January 19, 2012, Fattah emailed to Souza a certificate of
title for the Porsche.  The notarized document was signed by
Vederman as the purchaser and Chenault-Fattah as the seller

although neither appeared before a notary.  With this documentation in hand, CUMA approved the mortgage loan to close. The Fattahs purchased the Poconos property on January 25, 2012.

As it turned out, Vederman never took possession of the Porsche.  Instead, Chenault-Fattah continued to drive the Porsche and to have it serviced and insured long after the purported sale had taken place.  Moreover, the Porsche remained registered in Chenault-Fattah's name, and was never registered to Vederman.  When FBI agents searched the Fattahs' home in 2014, the Porsche was discovered in the Fattahs' garage.  Inside the Porsche were personal items belonging to Chenault-Fattah, an insurance card in the name of the Fattahs, a registration form in the name of Chenault-Fattah, and a parking receipt from October 2012.  The odometer of the Porsche showed that it had been driven approximately 600 miles since the time it had been "sold" to Vederman.

Souza agreed at trial that if no car sale had taken place and the information provided was false, the underwriter would not have been able to approve the loan.  She was also questioned at trial whether CUMA would have approved the mortgage loan to the Fattahs if the $18,000 had been a gift from Vederman to the Fattahs.  She responded that CUMA has "limitations as to who can give a gift" and that typically only family members may do so.  She also explained that CUMA would

-6-

have required a "paper trail" documenting the gift, including a
gift letter signed by both donor and donee and a bank statement
or other evidence of Vederman's ability to make the gift.

Around the same time that the Fattahs were purchasing
the Poconos property, Fattah hired Vederman's longtime
girlfriend, Alexandra Zionts, to work in his Philadelphia
office.  Zionts had previously worked for a federal magistrate
judge in Florida and needed a new job in the federal government
to continue her benefits and to obtain a pension.  Vederman
assisted Zionts in her job search, which included calling
Fattah.  Fattah hired her, a move that put his congressional
office overbudget.  Zionts was employed in Fattah's office for
about two months.  She remained in Florida for about half of
that time and performed limited work while in Philadelphia.

III

The jury convicted Vederman of bank fraud, in
violation of 18 U.S.C. § 1344, and false statements to a
financial institution, in violation of 18 U.S.C. § 1014, and
aiding and abetting the commission of these offenses by Fattah,
in violation of 18 U.S.C. § 2.  On August 15, 2016, after trial,
Vederman moved for a judgment of acquittal or a new trial on all
counts of conviction under Rules 29(c) and 33(a) of the Federal
Rules of Criminal Procedure.  As to Counts 19 and 20, Vederman
argued that the car sale was legitimate and thus the statements

-7-

by him and Fattah to CUMA were true.  In the alternative, Vederman maintained that that even if the evidence were sufficient to conclude that no real sale occurred, there was insufficient evidence that the sham sale was designed to fool the bank or that the existence of an actual sale of the Porsche was material to the bank.

In ruling on the post-trial motions of Vederman and his co-defendants, this court granted a judgment of acquittal and vacated Vederman's convictions for bank fraud and false statements in Counts 19 and 20.  It did so based on its determination that the evidence was insufficient to show that CUMA, the entity to whom Fattah and Vederman made the false statements, is a "financial institution" or, more specifically, a "mortgage lending business," as defined in 18 U.S.C. §§ 20 and 27.  Because those statutes are limited to fraud on or false statements to a "financial institution," the convictions could not stand.  The court did not rule on his alternative arguments regarding lack of materiality.

Vederman appealed his convictions on all counts that withstood the post-trial motions.  The Government cross-appealed with respect to the court's judgment of acquittal on Counts 19 and 20.  The Government asserted that the convictions should be reinstated because there was sufficient evidence to support the convictions for bank fraud and false statements to a financial

institution.  As part of its argument, the Government maintained that the evidence was sufficient for the jury to conclude that CUMA is a "mortgage lending business," which is one of the definitions of the term "financial institution."  See 18 U.S.C. § 20(10).

In response to the Government's cross-appeal, Vederman asserted that he was properly acquitted on Counts 19 and 20 or in the alternative that he was entitled to a new trial. Vederman contended that the district court correctly ruled that CUMA was not a "financial institution" within the scope of the statutes.  Vederman also argued to the Court of Appeals that there was insufficient evidence that he or Fattah made a false statement.  He reasoned that Chenault-Fattah signed over title to the vehicle, which effectuated a transfer of legal ownership under applicable state law, and therefore the statements about the Porsche sale were true even if Chenault-Fattah retained physical possession of the vehicle.  Finally, while Vederman did not challenge the jury instructions as to Counts 19 and 20, he asserted that errors made in connection with the instructions to the jury on the bribery counts equally tainted the CUMA counts.[3]

_____

3.  The jury convicted Vederman of bribery and conspiracy to commit bribery in Counts 16 and 18.  In support of those charges, the Government introduced evidence that Vederman gave to Fattah the $18,000 for the sham car purchase and other things of value in exchange for a job for Vederman's girlfriend and for Fattah's recommendation for an ambassadorship or other executive

Specifically, he maintained that "if there was no bribe," then describing the $18,000 as the proceeds of a car sale would not violate the statutes.  Instead, "[a]t worst" the $18,000 payment was "a <u>gift</u>," which "was immaterial to CUMA and played no role in obtaining [the] property."

In its reply, the Government reiterated its position that CUMA "finances or refinances any debt secured by an interest in real estate," which makes CUMA a "mortgage lending business" and therefore a "financial institution" for purposes of the federal criminal law.  <u>See</u> 18 U.S.C. §§ 20(10), 27.  It also disputed Vederman's argument that this court's judgment of acquittal should be affirmed on the alternative ground that the car sale was legitimate and thus the evidence was insufficient to establish a false statement.  Finally, it challenged Vederman's assertion that any legal error in his bribery convictions would necessarily also taint his convictions for bank fraud and false statements to a financial institution.

The Government pointed out that Vederman's challenge to his bribery convictions was based on whether the jury was instructed properly on the legal definition of "official acts" under 18 U.S.C. § 201.  The jury's determination that the payment from Vederman to Fattah did not constitute the proceeds

branch position.  As noted above, the Court of Appeals overturned his conviction on those counts as a result of the Supreme Court's decision in <u>McDonnell</u>.

of a car sale "is not affected by the legal determination
whether the acts taken by Fattah in return for the $18,000
constituted 'official acts.'"  In a footnote, the Government
stated:

> Vederman maintains that "if there was no
> bribe," then "[a]t worst" the $18,000
> payment was "a gift," which would have been
> "immaterial to CUMA."  That contention
> ignores the testimony of CUMA loan processor
> Victoria Souza that an $18,000 gift might
> not have been acceptable to CUMA.  Souza
> explained that if CUMA had been told that
> the $18,000 payment from Vederman to Fattah
> was a gift, then CUMA would have required
> additional documentation, including "a gift
> letter, a copy of the donor's ability to
> give the gift and a paper trail" in order to
> determine whether the gift met CUMA's
> guidelines.  Thus, even if Vederman were
> correct that the $18,000 was "[a]t worst
> . . . a gift" (and he is not), the
> defendants' false statement to CUMA that the
> $18,000 was the proceeds of a car sale was
> still material because it allowed them to
> avoid CUMA's requirements for documenting
> and reviewing gifts to a mortgagee.

(internal citations omitted).

        After considering these briefs and hearing oral
argument, the Court of Appeals ruled that the evidence was
sufficient to support the jury's verdict on Counts 19 and 20.
See United States v. Fattah, 914 F.3d 112, 146-47, 182 (3d Cir.
2019).  The Court "reinstated" those counts of conviction and
"remanded for sentencing" to this court.  See id. at 189.  In
doing so, the Court rejected our determination that CUMA was

merely "a loan processor for various credit unions which do the
financing or refinancing" and not a "mortgage lending business."
Id. at 183.

The Court of Appeals addressed Vederman's alternative
argument that the judgment of acquittal should stand because the
"Government did not put forth any evidence that he made a false
representation to CUMA" since there had been a "true sale" of
the Porsche as a matter of law when title was changed to his
name, regardless of who retained possession of the car.  Id. at
185-86.  The Court concluded that, "[c]onsidered in the light
most favorable to the Government, the totality of the evidence
is sufficient to support the jury's conclusion that the Porsche
sale was a sham."  Id. at 186.

The Court also rejected Vederman's assertion that his
convictions on Counts 19 and 20 were the result of prejudicial
spillover of evidence related to his RICO charge, of which he
was acquitted.  Id. at 188-89.  Specifically, Vederman had
asserted that the RICO charge interfered with his ability to
defend against the bribery and other charges by emphasizing his
close friendship with Fattah.  Id. at 188.  The Court explained:
"while Vederman's reliance on friendship might have helped him
defend against the bribery charges, that friendship would not
have altered the evidence pertaining to Counts 19-20 involving
CUMA.  Whether done for friendship or some other reason,

-12-

submitting fraudulent information to a financial institution is unlawful."[4]  Id. at 188–89.

IV

In his renewed motion for a judgment of acquittal or for a new trial, Vederman asserts that his convictions for bank fraud in Count 19 and false statements to a financial institution in Count 20 cannot stand because the Government failed to prove that he helped Fattah to obtain bank money "by means of" a material false statement, 18 U.S.C. § 1344(2), or otherwise lied "for the purpose of influencing" the bank's actions, id. § 1014.

---

4.  As to Vederman's convictions related to bribery and money laundering, the Court of Appeals remanded for a new trial.  As noted above, the Court concluded that the jury had not been properly instructed in light of the Supreme Court's ruling in McDonnell v. United States, 136 S. Ct. 2355 (2016), a decision handed down shortly after trial, which set forth new limitations on the definition of "official acts" as used in the honest services fraud and bribery statutes under which Fattah and Vederman had been convicted.  Fattah, 914 F.3d at 146, 152.  The Court rejected Vederman's argument that, even if the jury were properly instructed under McDonnell, there was insufficient evidence to convict him on these counts.  Id. at 159.  It noted that Vederman conceded that Fattah's hiring of Zionts would qualify as an official act under McDonnell.  Id.  The Court also rejected Vederman's argument that the evidence precluded any inference that the hiring of Zionts was an illegal bribe.  Id. It noted that Zionts did not receive written notice of her official hiring until six days after the sham Porsche purchase. Id.  Thus, on remand, a properly instructed jury could consider whether the Zionts hiring and other conduct by Fattah constituted official acts done in exchange for payments from Vederman.  Id. at 159-60.

We must first consider whether Vederman's motion is properly before this court.  Vederman asserted in his initial post-trial motion for judgment of acquittal or for a new trial that his statements were not material to CUMA.  As noted above, this court did not reach that issue because it ruled that Vederman's convictions for Counts 19 and 20 should be vacated on the theory that CUMA was not a mortgage lender.

Generally, "a federal appellate court does not consider an issue not passed upon below."  Singleton v. Wulff, 428 U.S. 106, 120 (1976).  However, the Court of Appeals may exercise its discretion to consider issues not raised and decided below if warranted based on the facts of individual cases, such as where proper resolution is beyond any doubt or where "injustice might otherwise result."  Id. at 121. Vederman, in our view, raised the issue of materiality in response to the Government's cross-appeal when he asserted that errors in this court's instructions on the bribery charges tainted the convictions for bank fraud and false statements. Specifically, he asserted that if the payment was not a bribe, it could have been a gift and that this fact would not have been material to or for the purpose of influencing CUMA.

The Court of Appeals at least implicitly rejected Vederman's argument made now in his renewed motion for judgment of acquittal or a new trial.  The Court of Appeals is of course

-14-

cognizant of the elements of the causes of action for bank fraud and false statements to a financial institution.  Significantly, it did not return the case to this court to consider Vederman's alternative arguments for judgment of acquittal or a new trial on Counts 19 and 20.  In contrast, it reinstated those convictions and remanded to this court for sentencing.  See Fattah, 914 F.3d at 182.  Indeed, the Court could not have reinstated those counts of conviction and directed that sentencing take place if evidence on one element was lacking. We note that its decision with respect to Counts 19 and 20 differed from its decision on the bribery-related and money laundering counts (Counts 16, 18, and 22-23) where the Court ordered a new trial because of the Supreme Court's subsequent decision in McDonnell.

"It is axiomatic that on remand for further proceedings after decision by an appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal." Bankers Tr. Co. v. Bethlehem Steel Corp., 761 F.2d 943, 949 (3d Cir. 1985) (citing Briggs v. Pa. R.R. Co., 334 U.S. 304, 306 (1948)).  Upon remand, we may consider issues not expressly or implicitly disposed of by the appellate decision and thereafter "make any order or direction in further progress of the case, not inconsistent with

the decision of the appellate court, as to any question not settled by the decision." Id. at 950.

In the event that the Court of Appeals did not pass upon the issue of materiality and returned the case to this court for consideration of this issue, we now turn to the merits of Vederman's motion. Vederman does not challenge the court's instructions with regard to his convictions for bank fraud and false statements to a financial institution. Instead, he challenges the sufficiency of the evidence with regard to these convictions. We reiterate that a defendant bears a very heavy burden when challenging the sufficiency of the evidence supporting a jury's verdict under Rule 29 and that motions under Rule 33 are granted "sparingly." See Silveus, 542 F.3d at 1005; Lore, 430 F.3d at 203-04.

The federal bank fraud statute, 18 U.S.C. § 1344, provides that "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice . . . to defraud a financial institution . . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." To prove a violation of § 1344, the Government must present evidence: (1) that the defendant knowingly executed or attempted to execute a scheme or artifice to defraud, that is, to obtain property under the custody or control of a financial institution by means of material false or fraudulent pretenses,

-16-

representations or promises, or omissions of material fact;
(2) that the defendant did so with the intent to defraud; and
(3) that the victim was a financial institution within the
definition of 18 U.S.C. § 20.  Third Circuit Model Criminal Jury
Instructions § 6.18.1344; see also Neder v. United States, 527
U.S. 1, 24-25 (1999).  In general, a false statement is material
if it has "a natural tendency to influence, or [is] capable of
influencing, the decision of the decisionmaking body to which it
was addressed."  See id. at 16; United States v. McBane, 433
F.3d 344, 350 (3d Cir. 2005).  Similarly, the language "by means
of" in § 1344(2) is satisfied where "the defendant's false
statement is the mechanism naturally inducing a bank (or
custodian of bank property) to part with money in its control."
Loughrin v. United States, 573 U.S. 351, 363 (2014).

     The federal statute prohibiting false statements to a
financial institution, 18 U.S.C. § 1014, provides:

> Whoever knowingly makes any false statement
> or report . . . for the purpose of
> influencing in any way the action of . . . a
> [financial institution] . . . shall be fined
> not more than $1,000,000 or imprisoned not
> more than 30 years, or both.

To obtain a conviction under § 1014, the Government must
establish:  (1) that the defendant made a false statement or
report; (2) that the defendant knew the statements were false
when he made them; (3) that the defendant did so for the purpose

-17-

of obtaining loans, or continuing to draw on existing loans; and
(4) that the victim was a financial institution within the
definition of 18 U.S.C. § 20.  See Williams v. United States,
458 U.S. 279, 284 (1982); United States v. El-Ghazali, 142 F.
App'x 44, 45 (3d Cir. 2005).  Although materiality is not an
element of § 1014, the statute requires that the defendant's
statement be made "for the purpose of influencing" the financial
institution's decision.  See United States v. Wells, 519 U.S.
482, 498-99 (1997).

     Here, there can be no dispute that Fattah, aided and
abetted by Vederman, knowingly made false statements to CUMA,
that is, that the $18,000 represented the proceeds of a car
sale.  See Fattah, 914 F.3d at 186.  Thus, resolution of
Vederman's renewed motion for a judgment of acquittal under Rule
29 turns on whether Fattah and Vederman's statements about the
car sale were material to CUMA under § 1344 or were made "for
the purpose of" securing funds from CUMA under § 1014.
According to Vederman, Fattah characterized the $18,000 as the
proceeds of a car sale rather than a gift from Vederman to avoid
Congressional ethics rules requiring the disclosure of gifts.
Vederman further posits that a gift of $18,000 would not have
precluded approval of the loan by CUMA.

     The record belies Vederman's position.  It
demonstrates that Fattah and Vederman went to great lengths to

conceal the nature of the $18,000 payment, creating an entire sham transaction.  When CUMA advised that it required documentation of the sale, Fattah, aided by Vederman, created a false and fraudulent bill of sale and title.  CUMA's agent Souza informed Fattah that CUMA would not approve the loan if it did not receive such documentation.  Souza also testified that CUMA would not have approved the loan if no car sale had taken place.

Further, Souza testified that an $18,000 gift from Vederman to Fattah would not have been acceptable to CUMA without proper documentation.  Souza explained that if Fattah had informed CUMA that the payment was a gift, CUMA would have required a "paper trial," including a gift letter signed by both Fattah and Vederman and evidence of Vederman's ability to give the gift.  She also testified that CUMA places restrictions on gift-giving and that generally only family members can provide gifts to support mortgage applications.  While Vederman may now assert that he could have simply given Fattah $18,000, the truth of the matter is that Fattah and Vederman never provided to CUMA any of the documentation required for approval of a gift and instead chose to rely on false and fraudulent paperwork to assert that the $18,000 represented proceeds from a car sale. We further note that the evidence presented at trial showed that Fattah could not accept an $18,000 gift from Vederman without written permission from the House Ethics Committee, which he did

not obtain, and that Fattah would have been required to report
any gift from Vederman on his annual financial disclosure.[5]

Furthermore, it is an exercise in speculation to
determine at this point whether CUMA would have approved the
loan if the payment was a gift.  In sum, the jury had more than
sufficient evidence to find beyond a reasonable doubt that
Vederman's false statements were material to CUMA and were the
means by which Fattah obtained CUMA's funds, 18 U.S.C.
§ 1344(2), and were "for the purpose of influencing" CUMA to
approve the mortgage loan and thus release the funds required to
close on the property, id. § 1014.

Vederman also asserts that a new trial is required on
Counts 19 and 20 because of legal errors committed with respect
to this court's jury instructions on the bribery counts in light
of McDonnell.  He reasons that any theory of sufficiency of the
evidence that rests on the jury having treated the $18,000 as an
illicit bribe requires, at a minimum, a new trial at which
"bribery" is correctly defined.

We reject this argument.  Upon deciding the bribery
instructions were incorrect, the Court of Appeals determined

---

5.  While those ethics rules may not be a source of criminal
liability, they carry important employment consequences such as
the potential for discipline or expulsion from Congress.  See
U.S. Const. art. I, § 5, cl. 2.  Furthermore, an investigation
by the House Ethics Committee may be referred to the Department
of Justice for a criminal investigation.

that a new trial was required on Counts 16, 18, and 22-23 but did not order a new trial for Counts 19 and 20.  Instead, it "reinstated" those counts and "remanded for sentencing."  See Fattah, 914 F.3d at 189.  Thus, the Court of Appeals ruled that the convictions on Counts 19 and 20 did not depend on whether the $18,000 payment was literally a bribe, but rather on whether the information given to CUMA was false and whether it influenced CUMA's decision-making.  See id. at 185-86, 187-89.

In sum, the decision of the jury was not based on insufficient evidence so as to compel the granting of a judgment of acquittal under Rule 29.  Nor does the interest of justice require a new trial under Rule 33.  Accordingly, the motion of Vederman for a judgment of acquittal or for a new trial on Counts 19 and 20 will be denied.