**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


**UNITED STATES OF AMERICA**          :

           **v.**                           :          **15-00346-002**

**HERBERT VEDERMAN**                  :


**GOVERNMENT'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S SECOND MOTION FOR BAIL PENDING APPEAL**


The United States of America, by its attorneys, Jennifer A. Williams, First Assistant

United States Attorney, Robert A. Zauzmer, Assistant United States Attorney and Chief of

Appeals, and Eric L. Gibson, Assistant United States Attorney for the District, responds as

follows to the second motion presented by Herbert Vederman seeking bail pending appeal. The

government respectfully submits that the motion should be denied.

**I.      Background**

In late 2011, former Congressman Chaka Fattah and his wife entered into a contract to

purchase a vacation home in the Pocono Mountains. Tr. 6/2/16 AM, at 77:22-89:13 (Exh.

CUMA-19). An estimate they received in late December 2011, which the Fattahs signed, advised

them that they would need to pay approximately $118,000 to the seller at the closing, which was

scheduled for late January 2012. *Id*. The Fattahs did not have the funds to make that payment.[1]

Tr. 6/2/16 PM, at 43:1-48:15.

---

[1] The Fattahs' financial inability to bring the necessary funds to the closing on their own
would obviously be a circumstance of import to the financial institution considering extending
their mortgage. Fortunately for the Fattahs, Vederman lurked in the background to portray their
finances and resources to the lender in a different – *and false* – light.

Right around the time the Fattahs received the closing-cost estimate, Fattah also received an email from defendant Herbert Vederman's girlfriend, Alexandra Zionts.   Zionts had been employed with the federal judiciary in Florida, where she lives. However, Zionts was terminated abruptly from that position ten months before she became eligible for discontinued service retirement benefits, which meant she needed to find a new position in the federal government to avoid a break in her federal service that would have disrupted her employment benefits. Vederman agreed to help Zionts find another job, and he made several calls on her behalf, including a call to Fattah. Zionts eventually spoke with Fattah about a job on his staff, and on December 26, 2011, just as the Fattahs were receiving their closing costs estimate, Zionts sent an email addressed to Fattah, through Fattah's district office manager Bonnie Bowser, which described her situation and attached a resume and letters of recommendation. Tr. 6/1/16 AM, at 105:16-141:5.

On January 13, 2012, approximately three weeks after Zionts sent her resume to Fattah, Vederman wired Fattah $18,000. Soon after receiving this wire transfer, Fattah wired $25,000 to an escrow account for the vacation home closing. *United States v, Fattah*, 914 F.3d 112, 138-39 (3d Cir. 2019). Without the $18,000 wire from Vederman, Fattah would not have been able to cover the $25,000 escrow payment. *Id*.

On January 19, 2012, six days after Vederman wired Fattah $18,000, Zionts received a letter from Bowser welcoming her to Fattah's congressional staff in his Philadelphia office. Exh. AZ-1.

For the two months that Zionts was employed by Fattah, she spent approximately half her time in Florida, although she did not take leave for that time. Tr. 6/1/16 AM, at 124:9-17. Several individuals who worked in Fattah's Philadelphia office during Zionts' brief tenure testified that

they did not know what her responsibilities were or what kind of work she was doing for the office. Tr. 6/1/16 AM, at 44:14-60:2 (Dolores Ridley); Tr. 6/1/16 AM, at 64:17-75:16 (Tia Watson). According to Zionts, she spent a "large part of [her] time" on an archiving project with Temple University, Tr. 6/1/16 AM, at 122:12-,130:16, but this "archiving project" consisted of one brief phone call and two emails, and nothing came of the project because Fattah's office had nothing the university was interested in archiving. The hiring of Zionts put Fattah's congressional office over budget. *Id*.

In an elaborate scheme of deception involving the creation of a fictitious email trail, a fake bill of sale, and a duplicate title, Fattah and Vederman used the bribery proceeds to defraud the bank into extending to the Fattahs a $325,000 mortgage. The defendants concealed the $18,000 payment from Vederman to Fattah as the proceeds of a car sale that never happened. On January 12, 2012, the day before Vederman's $18,000 wire to Fattah, Fattah's wife Renee Chenault-Fattah wrote to Vederman from Fattah's email account offering to sell him her 1989 Porsche 911 Carrera. Exh. C-9. Vederman responded less than two hours later agreeing to buy the car. Exh. C-10. The next day, Vederman sent his bank three separate emails inquiring about the status of the wire transfer to Fattah.

On January 17, 2012, Victoria Souza, a loan processor for the Credit Union Mortgage Association (CUMA), the mortgage company handling the purchase of the vacation home, emailed Fattah specifically asking about the source of the $18,000 that Vederman had just wired into Fattah's account. Exh. CUMA-5. Fattah responded to Souza that "the $18,000 represent [sic] the proceeds from the sale of a car we owned." *Id*. Souza then requested that Fattah provide a copy of the bill of sale and signed title to confirm the transaction.

In the four days after the $18,000 wire transfer from Vederman to Fattah, neither the purported buyer nor the purported seller said anything about documenting the car sale. However, just minutes after Souza emailed Fattah requesting that documentation, the defendants began making the arrangements to create a signed bill of sale and a copy of the title for the Porsche signed over to Vederman. The duplicate title was notarized, despite the fact that the seller, Chenault-Fattah, never appeared before the notary. *Fattah*, 914 F.3d at 139. Bowser emailed the bill of sale and signed-over title to Souza from Fattah's email account on January 19, 2012, the same day that Zionts received the letter from Bowser confirming her employment in Fattah's Philadelphia congressional office. Exh. CUMA-9; Exh. CUMA-10. The bill of sale that Fattah sent to Souza was backdated to January 16, 2012, the day before Souza requested the car-sale documentation from Fattah.

Notwithstanding Fattah's representations to CUMA, the Fattahs continued to fully control the Porsche, acting as owners would. In May 2012, approximately five months after the supposed car sale, the Fattahs reinstated insurance coverage on the Porsche without informing the insurance company of any change in ownership. Dkt. No 410 at 3-5. That same month, Fattah's wife renewed the registration of the Porsche in the Fattahs' name. *Id*. at 3. Even at the time of trial, that car had never been registered to Vederman. *Id*. In June 2012, approximately six months after the supposed car sale, Fattah's wife had the Porsche serviced at a car dealership, paying for the maintenance with her credit card. *Id*. In November 2012, over ten months after the supposed car sale, Fattah's wife called their insurance company to report that "we have the Porsche which we take off of insurance during the winter because we have it just in the garage," and to confirm that the Porsche was "still covered" because "it'll be in the garage," once again without mentioning any purported car sale. Dkt. No. 410 at 4-5; Exh. C-26a, transcript of

- 4 -

recording admitted as Exh. C-26. And in March 2014, over two years after the supposed car sale, the FBI found the Porsche in the Fattahs' garage. Tr. 6/1/16 PM, at 107:3-119:18. Inside the Porsche, the FBI found handbags and clothing, an insurance card in the name of the Fattahs, a registration form in the name of Chenault-Fattah, and a parking receipt from October 2012. *Id*.

On direct appeal, pursuant to *McDonnell v. United States*, 136 S. Ct. 2355 (2016), the Court of Appeals remanded for a new trial on the convictions of Fattah and Vederman as to the bribery and money laundering counts (Counts 16, 17, 18, 22, and 23). The Third Circuit concluded that the jury had not been properly instructed regarding "official acts" consistent with the *McDonnell* ruling.

In his direct appeal, Vederman also attacked his convictions, in part, on the argument that there was insufficient evidence of a bribery scheme. The Third Circuit rejected this position, holding:

> Vederman argues that there is insufficient evidence to support a conviction, even if a jury were properly instructed under *McDonnell*. Specifically, Vederman argues that there is insufficient evidence to convict him and Fattah, after remand, on Counts 16–18 and 22–23 because "[a]t least seven of the eight alleged 'official acts' were, as a matter of law, not official at all." Vederman Br. 35. As to the single act that Vederman implicitly concedes to be an official act—the Zionts hiring—Vederman argues that "[t]he only thing that even arguably associates" the Zionts hiring with Vederman was its timing in relation to Vederman's sham purchase of the Fattahs' Porsche. *Id*. According to Vederman, "the undisputed chronology precludes any inference that Vederman conferred this benefit on his friend as an illegal bribe." *Id*. (emphasis omitted). Vederman is wrong. Sufficient evidence was produced at trial to have allowed a properly instructed jury to convict Fattah and Vederman of Counts 16–18 and 22–23.
>
> To begin with, even if the Zionts hiring had been the sole official act to survive this Court's interpretation of *McDonnell*, there would still be sufficient evidence to convict Fattah and Vederman. Zionts did not receive written notice of her official hiring until six days after the sham Porsche purchase. Moreover, the jury would not be restricted to considering the chronology of the sham purchase alone. It would be free to consider Vederman's entire course of conduct. Under the general heading "VEDERMAN'S Payments and Things of Value to FATTAH," the redacted indictment not only refers to the $18,000 wire transaction from Vederman to Fattah as part of the sham Porsche purchase, but also to Vederman's $3,000 payment for the college tuition of Simone

Muller, Fattah's live-in au pair, as well as thousands of dollars in payments made by
Vederman for Chip Fattah's college tuition. JA496–97.

And the Zionts hiring is not the only act to survive our application of *McDonnell*. As we
explained, a jury could find that Fattah's efforts to secure Vederman an
ambassadorship—three emails, two letters, and a phone call—were an impermissible
attempt to "pressure or advise" President Obama, Senator Casey, or both men. This
means that a properly instructed jury on remand, presented with evidence of Fattah's
efforts to secure an ambassadorship for Vederman and evidence of the Zionts hiring,
could find more than a single official act.

*Fattah*, 914 F.3d at 959-60.[2]

In fact, Vederman's Jones Day attorneys conceded at oral argument that Fattah's hiring

of Vederman's girlfriend constituted an "official act" for purposes of the federal bribery statute.

*Fattah*, 914 F.3d at 156 ("Vederman concedes that the Zionts hiring was an official act").

The jury also convicted defendant Vederman, Fattah, and Bonnie Bowser of bank fraud

in violation of 18 U.S.C. § 1344 (Count 19) and making a false statement to a financial

institution in violation of 18 U.S.C. § 1014 (Count 20) based on the defendants' false

representations to the Credit Union Mortgage Association ("CUMA") about the purpose of the

$18,000 payment from Vederman to Fattah. This Court vacated those convictions, on the

grounds that CUMA was not a financial institution subject to these statutes. The government

appealed that ruling, and the Third Circuit reversed. It held, "CUMA is a 'mortgage lending

business,' and that alone suffices to support the convictions under §§ 1014 and 1344." *Fattah*,

914 F.3d at 185. The Court further held, "Considered in the light most favorable to the

Government, the totality of the evidence is sufficient to support the jury's conclusion that the

---

[2]   The Third Circuit disagreed with the District Court about the impact of *McDonnell* on
the bribery counts and remanded for a new trial so that the jury could be properly instructed.
However, in describing the trial evidence, this Court stated that "[t]he evidence was
overwhelming concerning the things of value or stream of benefits which Vederman showered
on Fattah for Fattah's official acts in pursuing the ambassadorship and in the hiring of
Vederman's girlfriend." Dkt. No. 538.

Porsche sale was a sham," *id.* at 186, and thus the jury's verdict on Counts 19 and 20 must be reinstated. The Third Circuit directed: "The convictions of Chaka Fattah, Sr. and Herbert Vederman will be reinstated, and the case will be remanded for sentencing on those counts." *Id.* at 189.

On remand, Vederman filed a motion for judgment of acquittal or a new trial on Counts 19 and 20, presenting, in part, the same argument that he now states justifies bail pending appeal: that the instructional error regarding the bribery charges also requires a new trial on the fraud counts. He further contended that he should be acquitted on the fraud counts, as his false statements were not material. This Court denied the motion, rejecting these arguments. Dkt. No. 706 (Mar. 22, 2019).

Next, the parties reached an agreement under which the government dismissed the bribery charges, and the Court proceeded to impose sentence on Counts 19 and 20.   The parties agreed to mutually recommend a term of imprisonment of 12 months and one day on these counts.   At sentencing on September 5, 2019, the Court rejected that recommendation and imposed a term of imprisonment of 24 months.   The Court ordered Vederman to report for service of his sentence on November 4, 2019.

## II.    Discussion

### A.    The Defendant Is Not Entitled to Bail Pending Appeal.

Pursuant to 18 U.S.C. § 3143(b), bail pending appeal is available only in limited circumstances. The statute provides:

> [T]he judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds

(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in

      (i)      reversal,

      (ii)     an order for a new trial,

      (iii)    a sentence that does not include a term of imprisonment, or

      (iv)    a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

If the judicial officer makes such findings, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c) of this title, except that in the circumstance described in subparagraph (B)(iv) of this paragraph, the judicial officer shall order the detention terminated at the expiration of the likely reduced sentence.

Thus, as the Court of Appeals has summarized, bail pending appeal may be granted only if the defendant establishes:

(1)    that the defendant is not likely to flee or pose a danger to the safety of any other person or the community if released;

(2)    that the appeal is not for purpose of delay;

(3)    that the appeal raises a substantial question of law or fact; and

(4)    that if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed.

*United States v. Miller*, 753 F.2d 19, 24 (3d Cir. 1985).

Congress has clearly expressed a legislative preference that a defendant be incarcerated upon the imposition of sentence. As the Court of Appeals explained in *Miller*, the manifest purpose of Congress in enacting this provision of the Bail Reform Act of 1984 was to reverse the

presumption of bail which applied under prior law in this situation. 753 F.2d at 22. Under the

Act, the instances of bail pending appeal should be "considerably reduced in number." *Id*. at 24.

*Miller* quoted favorably from a 1970 House report, written at the time Congress, writing

legislation for the District of Columbia, first adopted the provision which became applicable

nationwide in 1984:

> [O]nce a person has been convicted and sentenced to jail, there is absolutely no reason for
> the law to favor release pending appeal or even permit it in the absence of exceptional
> circumstances. First and most important, the conviction, in which the defendant's guilt of a
> crime has been established beyond a reasonable doubt, is presumably correct in law, a
> presumption factually supported by the low rate of reversal of criminal convictions in the
> Federal system. Second, the decision to send a convicted person to jail and thereby reject
> all other sentencing alternatives, by its very nature includes a determination by the
> sentencing judge that the defendant is dangerous to the person or property of others, and
> dangerous when sentenced, not a year later after the appeal is decided. Third, release of a
> criminal defendant into the community, even after conviction, destroys whatever
> deterrent effect remains in the criminal law. Finally . . . the purpose of the appellate
> process is not to give a convicted criminal, by means of release pending appeal, an
> opportunity to demonstrate a basis for reducing a sentence after the conviction has been
> affirmed.

*Miller*, 753 F.2d at 22 (quoting H. Rep. No. 907, 91st Cong., 2d Sess. 186 87 (1970)).

Under the law, the failure to satisfy even one of the four factors outlined in *Miller*

requires that bail be denied.

### 1.      **Risk of flight and danger to the community**.

Risk of flight is not the determinative factor here. Vederman does not appear to pose a

risk of flight or danger to the community.

### 2.      **Appeal presented for purpose of delay**.

However, the defendant appears clearly motivated to delay his incarceration again. As

explained below, Vederman simply rehashes arguments already presented to the Court of

Appeals. The Third Circuit rejected his arguments, and there is no reason to believe they will

have any traction in their current repackaging.

### 3. Substantial question.

To justify bail pending appeal, assuming that he does not present a risk of flight or a

danger to the community, a defendant must set forth "a substantial question of law or fact." An

issue is "substantial" if it "is one which is either novel, which has not been decided by

controlling precedent, or which is fairly doubtful." *Miller*, 753 F.2d at 23. Even an issue on

which there is no controlling precedent is not "substantial" where the issue is "patently without

merit." *United States v. Smith*, 793 F.2d 85, 89 (3d Cir. 1986). Rather, an issue qualifies as

"substantial" only where it is "fairly debatable." *Id*.

The defendant's motion presents no such issue. Indeed, Vederman does not even attempt

to argue that his claims are "novel" or uncontrolled by precedent.

Vederman asserts that his convictions for bank fraud (Count 19) and false statement to a

financial institution (Count 20) cannot stand, because the government "hing[ed] the bank-fraud

and false-statement counts on the bribery counts." Dkt. No. 753-2 at 10.

Vederman merely repeats his previous inappropriate attack on the Court of Appeals'

judgment, an attack this Court has already soundly rejected. As noted above, this Court had

entered judgments of acquittal on Counts 19 and 20 on the grounds that CUMA was not an

institution subject to the bank fraud and false statement statutes. The government appealed that

ruling, and the Third Circuit reversed.

When defending the judgment on appeal, Vederman, as is appropriate, advanced

alternative grounds supporting acquittal on the counts. *See, e.g., United States v. Mussare*, 405

F.3d 161, 168 (3d Cir. 2005) (an appellee may advance and the Court of Appeals may affirm on

any ground supported by the record). Vederman already presented precisely the same arguments on appeal that he renews here *again*, and the Court of Appeals, in reversing the acquittal and ordering resentencing on Counts 19 and 20, necessarily rejected those arguments. That alone requires denial of Vederman's latest attempt to avoid incarceration. In any event, for purposes of completeness, we explain again why the jury's verdict on Counts 19 and 20 must stand.

The defendant's theory (which this Court rejected after the remand from the Court of Appeals) is that the jury, when it convicted Vederman on Counts 19 and 20, addressing false statements to the mortgage lender, necessarily found that the falsity inhered in the failure to disclose that the $18,000 provided to Fattah was a bribe as opposed to some other transaction. Thus, Vederman contends, the incorrect instructions regarding the meaning of a bribe also affected the jury's consideration of Counts 19 and 20.

This is a meritless claim, given that the convictions on Counts 19 and 20 did not depend on whether Vederman paid a bribe.[3]

To prove bank fraud (Count 19), in violation of 18 U.S.C. § 1344, the government must demonstrate the following:

| | |
|---|---|
| First: | The defendant knowingly executed or attempted to execute a scheme or artifice to defraud, that is, to obtain property under the custody or control of a financial institution by means of material false or fraudulent pretenses, representations or promises, or omissions, of material fact; |
| Second: | The defendant did so with the intent to defraud; and |
| Third: | That CUMA was a financial institution within the definition in 18 U.S.C. § 20. |

---

[3]   It bears noting that, in order to avoid retrial on the bribery counts, Vederman stipulated for sentencing purposes that he participated in conduct constituting bribery. Dkt. No. 748-1. Having avoided retrial and despite his stipulation, Vederman now brazenly argues again that instructional error at his trial should somehow undermine his recent admissions, and that the conduct he admitted to before this Court at his sentencing should be disregarded in his latest attempt to avoid or delay his accountability.

*See* Mod. Crim. Jury Instr. 3d Cir. 6.18.1344.

"In general, a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed." *Neder v. United States*, 527 U.S. 1 (1999). The government was required to prove that the defendants executed a scheme to defraud CUMA "by means of false…representations." 18 U.S.C. § 1344; Jury Instr. ¶ 148. This "by means of" language is satisfied when "the defendant's false statement is the mechanism naturally inducing" the financial institution "to part with money in its control." *Loughrin v. United States*, 573 U.S. 351, 363 (2014).

To prove false statements to banks (Count 20), in violation of 18 U.S.C. § 1014, the government must demonstrate the following:

| | |
|---|---|
| First: | The defendant made false statements to a financial institution; |
| Second: | The defendant knew the statements were false when he made them; |
| Third: | The defendant did so for the purpose of obtaining loans, or continuing to draw on existing loans, from the financial institution; and |
| Fourth: | That CUMA was a financial institution within the definition in 18 U.S.C. § 20. |

*See United States v. El-Ghazali*, 142 F. App'x 44 (3d Cir. 2005) (not precedential). Although ignored by the defendant in his motion, *materiality of the falsehood is not an element of the crime of making false statement to a financial institution*. *United States v. Wells*, 519 U.S. 482, 489-99 (1997). Consistent with *Wells*, the circuit courts have concluded that the government also need not prove a risk of loss. *See United States v. Taylor*, 808 F.3d 1202 (9th Cir. 2015) (collecting cases). Reliance on the false statements is also not an element of an 18 U.S.C. § 1014 prosecution. *See United States v. Tokoph*, 514 F.2d 597, 604 (10th Cir. 1975).

Thus, the gravamen of both charges is the making of a false or fraudulent statement. At this stage, it may no longer be disputed that Fattah made false statements to CUMA, abetted by Vederman, satisfying the fraud and false statement elements of both counts of conviction. Fattah told CUMA that $18,000 of his payment came from the proceeds of a car sale, a transaction that both this Court and the Court of Appeals found, based on overwhelming evidence, was a "sham." *See, e.g., Fattah*, 914 F.3d at 159, 186; Dkt No. 706 at p. 19 (this Court's denial of Vederman's motion for acquittal or new trial). Those representations were made in Fattah's emails to CUMA employee Victoria Souza, which Fattah forwarded to Vederman, and in the bill of sale and duplicate title signed by Vederman and forwarded to Souza by Fattah. Exhs. CUMA-5 (email from Fattah to Souza dated January 17, 2012), CUMA-9 (email from Fattah to Souza attaching signed bill of sale dated January 19, 2012), CUMA-10 (email from Fattah to Souza attaching signed-over duplicate title dated January 19, 2012).

With regard to Count 20, alleging a violation of Section 1014, the statute requires proof that the false statements were "made for the purpose of influencing in any way CUMA's action." Jury Instr. ¶ 241. That requirement is obviously met. The defendants did not create fake documentation of a fictitious car sale for fun; they went to extensive effort to deceive CUMA as to the source of Fattah's funds and thereby assure CUMA's approval of the loan. The elements of the crimes are plainly met whether the payment consisted of a bribe or not. The defendant will not prevail on appeal.

The true purpose of the deceit, as to CUMA, was to conceal the fact that the Fattahs did not have the financial wherewithal to take on the loan. While Vederman insists that the fraud rested on whether or not the payment was a bribe in violation of federal law, the Court of Appeals obviously did not agree. Upon deciding that the instructions as to bribery were incorrect,

the Court carefully considered the remedy, determining that the ruling necessitated a new trial on Counts 16 to 18 and 22 to 23, but not Counts 19 and 20. It is evident that the Court properly understood that the conviction on Counts 19 and 20 did not depend on whether the $18,000 payment was literally a bribe, but rather on whether the information given to CUMA was false and could have influenced its decision-making. This is apparent in the portion of the Third Circuit's opinion rejecting Vederman's argument that he was entitled to a new trial on Counts 19 and 20 because of prejudicial spillover from the evidence of a widespread RICO bribery conspiracy, charged in Count One, from which Vederman was later removed. The Court of Appeals stated: "while Vederman's reliance on friendship might have helped him defend against the bribery charges, that friendship would not have altered the evidence pertaining to Counts 19–20 involving CUMA. Whether done for friendship or some other reason, submitting fraudulent information to a financial institution is unlawful." *Fattah*, 914 F.3d at 188-89.

The Third Circuit already rejected Vederman's claim that his conviction for the financial institution counts depended upon a bribery conviction. Vederman's argument presumes that the nature of the transaction was only material to CUMA if it literally qualified as a bribe in violation of federal law. But that is not so, either as a factual matter or as a matter of law under the bank fraud statutes. The Court of Appeals held that the jury instructions as to bribery were flawed in light of *McDonnell*, decided after the trial, which defined the type of "official act" which must be sought in exchange for an unlawful payment. That flaw, the Court then held, required a retrial on Counts 16 to 18, charging conspiracy to commit bribery and honest services fraud, as well as substantive charges of bribery, in violation of 18 U.S.C. § 201. And the Court also ordered a retrial on Counts 22 and 23, charging money laundering, in violation of 18 U.S.C. § 1957, in that the government there must prove "specified unlawful activity," that is, a violation

of the bribery statute.  *See* 18 U.S.C. § 1957(f)(3) (defining "specified unlawful activity" by reference to § 1956(c)(7), which includes any act involving § 1343 (relating to wire fraud) or "bribery of a public official").

In contrast, a violation of the federal bribery statute is not an element of bank fraud. Here, the defendants' false statement was that the $18,000 payment was for a car purchase, as opposed to a payment to a Congressman, concealed from the public, to induce favorable treatment. The conduct being concealed was nefarious whether Fattah technically promised an "official act" as defined in *McDonnell* or not. Thus, when Ms. Souza testified that if she knew that the $18,000 was actually the proceeds of a bribery scheme CUMA would not have approved the mortgage, Tr. 6/2/16 AM, at 119:14-18, she surely did not limit herself to a situation in which CUMA would only be deterred by a bribe that met every element of federal criminal law. Here, as the Court of Appeals found (in the passage quoted earlier), there was ample evidence allowing a reasonable jury to conclude that Vederman paid $18,000 not for a car (as CUMA was told) but to facilitate the hiring of Zionts for a no-show (or low-show) government job. Vederman has stipulated to these facts. Dkt. No. 748-1. There is no question that concealment of that information would be material to any lending institution, as Souza testified that it was to CUMA.

This Court has decisively rejected the argument, stating that the Third Circuit "could not have reinstated those counts of conviction and directed that sentencing take place if evidence on one element was lacking." Dkt. No. 706 at p. 15 (opinion denying motion for acquittal or new trial). "Upon deciding the bribery instructions were incorrect, the Court of Appeals determined that a new trial was required on Counts 16, 18, and 22-23 but did not order a new trial for Counts 19 and 20. Instead, it 'reinstated' those counts and 'remanded for sentencing.' *See Fattah*, 914

F.3d at 189. Thus, the Court of Appeals ruled that the convictions on Counts 19 and 20 did not depend on whether the $18,000 payment was literally a bribe, but rather on whether the information given to CUMA was false and whether it influenced CUMA's decision-making. *See id.* at 185-86, 187-89." Dkt. No. 706 at pp. 20-21.

No reasonable court could disagree. Thus, Vederman has not presented any basis for bail pending appeal.

**III.     Conclusion**.

For all of the foregoing reasons, defendant Vederman has failed to identify any substantial issue "likely to result" in reversal. He is therefore not entitled to bail pending appeal. Accordingly, the government respectfully submits that the defendant's second motion for bail pending appeal should be denied.

Respectfully yours,

JENNIFER A. WILLIAMS
First Assistant United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals


*/s Eric L. Gibson*
ERIC L. GIBSON
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I certify that a copy of the Response in Opposition to Defendant's Second Motion for

Bail Pending Appeal was served by electronic service on all counsel of record:

> David L. Axelrod, Esq.
> R. Stephen Stigall, Esq.
> Terrence Grugan, Esq.
> Ballard Spahr LLP
> 1735 Market Street, 51st Floor
> Philadelphia, PA   19103
>
> Jacob M. Roth, Esq.
> Jones Day
> 51 Louisiana Avenue NW
> Washington, DC   20001

> _s/ Eric L. Gibson_
> ERIC L. GIBSON
> Assistant United States Attorney

Date:   September 12, 2019.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**UNITED STATES OF AMERICA**          :

          **v.**          :          **15-00346-002**

**HERBERT VEDERMAN**          :


**ORDER**


      AND NOW, this _____ day of _____, 2019, it is hereby

ORDERED

that the defendant's Second Motion for Bail Pending Appeal is DENIED.


                          _____
                          HONORABLE HARVEY BARTLE, III
                          United States District Judge